# Attachment

# B

See above.

**REQUEST FOR ADMISSION #90**
Specifically Admit that by engaging in a "Protected Activity" affords the Plaintiff (complaining party) protection from retaliation, from any source (Defendant and Nancy Goss).

**Admit or Specifically Deny:**

*Objection.* Defendant objects as the foregoing assumes facts not in evidence and calls for a legal conclusion.

Jonathan R. Secrest (#0075445)

**INTERROGATORY #CJ**
If your response to the foregoing Request for Admission is anything but an unqualified admission, please state the facts supporting your response.
**Response:**

*Objection.* Defendant objects as the foregoing assumes facts not in evidence and calls for a legal conclusion.

Jonathan R. Secrest (#0075445)

**REQUEST FOR ADMISSION #91**
Specifically Admit that Nancy Goss was terminated on Friday, October 1, 2004.

**Admit or Specifically Deny:**

Admit.

**INTERROGATORY #CK**
If your response to the foregoing Request for Admission is anything but an unqualified admission, please state the facts supporting your response.
**Response:**

See above.

**REQUEST FOR ADMISSION #92**
Specifically Admit that Monday, October 4, 2004 is 3 (three) days after or later than Friday, October 1, 2004.

# Attachment C

Interview Version

# INVESTIGATION STATEMENT

### Form B

| NAME | |
|---|---|
| ▮▮▮▮▮▮ | |
| POSITION<br>Administrative Assistant to the<br>▮▮▮▮▮▮ | |
| INTERVIEWER(S)<br>▮▮▮▮▮▮ | |
| DATE INTERVIEWED<br>▮▮▮▮▮▮ | |
| TIME START<br>▮▮▮▮ | |
| TIME STOP<br>▮▮▮▮ | |
| LOCATION OF INTERVIEW<br>▮▮▮▮▮▮ | |
| OTHERS PRESENT DURING<br>INTERVIEW? ▮▮▮▮<br>▮▮▮▮▮▮ | ☐   NO<br>☒   YES, WHO |
| POSITION<br>▮▮▮▮▮▮ | |

The allegations of the Complainant have been explained to you. We will now go over them individually. For each allegation, please answer the following questions:

1. Did you write the letter to Lisa Ellis, attached to this statement as Exhibit 1?

   Yes, I wrote the letter.

2. If yes:

   What exactly did you do?

   I sent the letter ~~from~~ ˏon my way home from the plant to her home address.

   Why?

   Because my therapist told me I needed to forgive her and explain exactly what I was forgiving her for.

   When and where did this occur?



Interview Version

I wrote the letter on 9/22 on my lunch hour.  I was explaining the specific things I forgave her for.  I didn't intend to be intimidating.

Were there any witnesses?

No

3.  If no:

Did you have <u>any</u> interaction with the Complainant on that day?

We talked, but we were friendly with each other all week.  I hope she will agree with that.

Are there any past issues between you and the Complainant?

It has been brewing for several weeks.  The issues are stated in the letter.

**Continued Discussion Requested by Named Individual**

October 2, 2004 –
LOCATION:  Personal residence of Nancy Goss, Zanesville OH
INDIVIDUALS:  Nancy Goss and Carol Kagenski

4.  What were the additional issues you wanted to discuss?

The relationship ended between Kevin and me because I told him I was beginning to have serious feelings for him and he didn't want to have anything to do with that. Our relationship ended around July.  There are so many things you need to know.

His verbal expressions to me about his desires what he wanted to do with other female employees caused me emotional stress and difficulties handling it.

5.  What kind of things?

During my affair with him, he would send me emails at work with sexual content. Kevin and Lisa Ellis also exchanged inappropriate emails with sexual content.  Kevin would brag about masturbating in his office and that he would download porn to make copies onto CDs.  Exhibits 2, 3, 4 and 5 attached to this statement are examples of such emails, which I have provided to Human Resources.

6.  May I have the CD?

Yes, take it with you.

7.  How is Lisa involved in this, if at all?

When Lisa and I were close friends, we shared personal secrets with each other.  She told me she had sex numerous times on her lunch hour back in the small conference

**Interview Version**

room with her friend from the Scout club. She told me she has phone sex in the small conference room with another friend. She has been sexually active with other friends too.

8. Here at work?

Except for kmc (her Scout friend) and the phone sex, I don't think all the others happened here. According to Lisa, she was hurt by Mary when Mary addressed Lisa's affair with kmc. Lisa said Mary told her she was behaving no differently than when Melinda White had an affair with her (Lisa's) husband. I think Jane may have thought something was going on, too. I have no knowledge if either Mary or Jane knew this was going on in the small conference room.

9. What does the letter 'B' stand for?

Kevin. We had a nickname Boris from the cartoon Bullwinkle and my nickname was Natasha.

10. Here's a copy of your letter. As you can see, someone had blackened out some of the words, which appear to be names. What are those names?

Fred – he's from Motion Electric and is the one Lisa had phone sex with back in the small conference room – Fen, who is a friend from Boy Scouts, T – just a letter for Tom [Evans] and kmc is for Keith McCormick".

11. Can you provide me with a fresh, unblemished copy?

I'd have to come in to the office to get it off my computer and am willing to do that.

12. What other events occurred which led up to your letter?

Just that Lisa and I started ~~having confrontations~~ avoiding each other shortly after I broke off with Kevin. I'm pretty sure they were still sending inappropriate emails back and forth. This irritated me and I sent them an email to ask them to keep 'it' out of the workplace.

13. What did you mean by "it"?

Their inappropriate, sexual, misconduct. I have a strong feeling they have continued the emails.

**I have read this document and I hereby agree that it is true and correct to the best of my knowledge, and accurately represents my statements regarding this issue. I understand that any retaliation by me toward any individual because of this matter will result in corrective action up to and including termination.**

_Nancy J. Moss_                    _10/13/04_
                                   Date

# Attachment D

Nestlé Purina PetCare

October 19, 2004

Kevin McKenna
4885 Adamsville Road
Zanesville, OH 43701

Kevin:

This correspondence is provided to you in response to your e-mail dated
October 18, 2004.

The decision, which led to your termination of employment, was based on
your violation of the Information Security Policy as it relates to electronic
communications. Additionally, you admitted to this violation. Furthermore,
your termination has no relationship to any previous conversations you may
have had with our local HR Manager.

At this time, we do not see need for continued discussion regarding this
matter.

Regretfully,

Mitzi Link
Controller

cc: Dante Benincasa
Carol Kagenski

Nestlé

# Attachment E



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Cleveland District Office**

1660 West Second Street, Suite 850
Cleveland, OH 44113
(216) 522-2001 or 2002
TTY (216) 522-8441
FAX (216) 522-7395

June 8, 2005

Mr. Kevin McKenna
4885 Adamsville Road
Zanesville, OH 43701

**RE:     EEOC Charge No. 22A-2005-02413 – Nestle Purina PetCare Co.**

Dear Mr. McKenna:

This is to acknowledge your charge of employment discrimination against the above named Respondent. The information you have provided indicates that your charge is subject to **Title VII of the Civil Rights Act of 1964, as amended.**

A copy of your charge will be provided to the Respondent as required by our procedures. The Commission's regulations require that you notify this office of any change of address and keep us informed of any prolonged absence from your current address. Your failure to cooperate in this matter may lead to the dismissal of your charge.

Also, enclosed are the Mediation Fact Sheet and Choice Form. Please review the fact sheet and decide whether you wish to consider your case for mediation. If so, please return the signed mediation election form.

The assigned investigator will contact you when he/she needs further information or assistance. **In the meantime, it you would like the status of your charge prior to being contacted by an investigator, you may call (216) 522-2001 and the person answering the phone can give you the status.** Please refer to the above mentioned charge number(s) whenever you contact the Commission about your charge.

Sincerely,

Ms. S. Austin
Investigator Support Assistant

# Attachment F

EEOC
CLEVELAND DISTRICT OFFICE

JUL 07 2005

RECEIVED

Nestlé USA
Legal Department

800 NORTH BRAND BLVD.
GLENDALE, CA 91203

TEL (818) 549-6083
FAX (818) 549-5840



LEGAL DEPARTMENT

July 6, 2005

Mr. Daniel Cabot
Enforcement Manager
Cleveland District Office
1660 West Second Street
Suite 850
Cleveland, OH 44113

            Re: Kevin McKenna/Nestlé Purina PetCare
            Charge No: 22A-2005-02143

Dear Mr. Cabot:

        This will serve as the position statement[1] of the Respondent Nestlé Purina
PetCare Company ("NPPC" or the "Company") to the above-referenced charge of
Discrimination filed by Kevin McKenna with the Equal Employment Oppotunity
Commission (the "Charge").

        NPPC is a pet care products manufacturing company with a number of
manufacturing facilities throughout the United States. This case concerns personnel in
NPPC's Zanesville, Ohio facility, which manufactures pet food. In his Charge, Mr.
McKenna alleges that his employment was terminated because of his gender (male),
and in retaliation for a complaint he made to HR.

        NPPC denies that it discriminated against Mr. McKenna based on his gender or
any other unlawful reason. As is explained more fully below, Mr. McKenna was
terminated for violating the Company's electronic communications policy. In making its
decision to terminate Mr. McKenna's employment, NPPC followed its usual practices

---

[1] The statement of position set forth herein is based on the undersigned's understanding of the facts at the time of this
statement. By submitting this statement of position, the Respondent in no way waives its right to present new or
additional facts or arguments as they become known. Furthermore, the statement of position, while believed to be
true and correct in all respects, does not constitute an affidavit. The statement of position is submitted on the express
condition that it not be used as evidence of any kind in any administrative or court proceeding in connection with the
above-captioned case, or in any other case involving the Respondent.

Nestlé. Good Food, Good Life

Mr. Daniel Cabot
July 6, 2005

Page 2

and procedures. Accordingly, the agency should issue a "no cause" determination in this matter.

### I.     Factual Background

**A. The Zanesville Love Triangle.** The instant case arises out of a love triangle between the Charging Party, Mr. McKenna, and two of his female co-workers at the Zanesville facility. Mr. McKenna worked as a Systems Technical Specialist in the accounting department. The women involved were Lisa Ellis (Inventory Accounting Coordinator, accounting department) and Nancy Goss (Secretary to the Plant Manager, operations department).

Apparently Mr. McKenna had maintained a consensual, sexual relationship with Nancy Goss, which Ms. Goss ended in July of 2004. We do not know exactly when the relationship began; however, during the course of the events described here both parties always indicated that the relationship was consensual. After the break up of the McKenna/Goss relationship, Ms. Goss began to suspect that Mr. McKenna had commenced a sexual relationship with another employee at NPPC, Lisa Ellis. Ms. Goss considered Ms. Ellis to be her friend and became angry about the thought of Ms. Ellis having such a relationship with Mr. McKenna. A series of conversational emails began circulating among these three employees in which all three traded barbs and accusations regarding the alleged affair between Mr. McKenna and Ms. Ellis. Both Mr. McKenna and Ms. Ellis denied a romantic or sexual involvement with one another. However, Ms. Goss did not believe them and a significant amount of animosity built up among these employees in a short period of time.

**B. Mr. McKenna's August 2004 "Complaint" to HR.** No one in management or HR at the Zanesville facility was aware of the so-called "love triangle" while those events were transpiring. Instead, the situation came to light when Mr. McKenna went to Carol Kagenski in HR on August 31, 2004 and informed her of what he characterized as a "hazardous situation" with Nancy Goss. He told Ms. Kagenski that Ms. Goss was "obsessed" with him and jealous of his relationship with Lisa Ellis. He expressly stated to Ms. Kagenski that he did not want any action taken against Ms. Goss; he only wanted HR to be aware of the situation. He told Ms. Kagenski that he would bring her the emails which evidenced Ms. Goss's obsession.

Instead of returning to HR with the emails, Mr. McKenna delivered to Ms. Kagenski a typewritten letter in which he stated he wished to "withdraw" his complaint and clarify that his earlier visit was meant to be a "casual, off the record" conversation. Exhibit A (Letter from Kevin McKenna to Carol Kagenski). He formally and emphatically stated, in writing, that he wished HR to take no further action. He declined to provide

Mr. Daniel Cabot
July 6, 2005

Page 3

HR with copies of the emails he had described earlier.  Notably, Mr. McKenna did not
complain of sexual harassment, a fact which is documented and confirmed by his
memo.

      **C.  Ms. Goss's Visit to HR.**  On or about September 6, 2004, Nancy Goss went
to Ms. Kagenski and reported that she had had a consensual affair with Kevin
McKenna.  She said that since the break up, the atmosphere between herself, Mr.
McKenna and her friend Lisa Ellis had become uncomfortable at work.  Ms. Goss
stated that she had received many emails from Mr. McKenna, and they had become
very rude of late.  This is what led her to break off the relationship.  Ms. Goss gave Ms.
Kagenski copies of some of the emails from Mr. McKenna.  Exhibit B.

      **D.  Mr. McKenna's Second Visit to HR.**  On or about September 17, 2004, Mr.
McKenna returned to HR and told Ms. Kagenski that he feared Ms. Goss was "going to
blow."  He said that Lisa Ellis told him of a hostile confrontation she had had with Ms.
Goss.  Ms. Kagenski immediately interviewed Lisa Ellis about this.  Ms. Ellis stated that
she had been friends with Ms. Goss in the past, but that since the break up between
Ms. Goss and Mr. McKenna, her friendship with Ms. Goss began to deteriorate because
Ms. Goss assumed Ms. Ellis was now involved with Mr. McKenna.  Ms. Ellis said that
she felt intimidated by Ms. Goss.

      **E.  Ms. Ellis's Complaint to HR, the Investigation and Termination of Mr.
McKenna's Employment.**  On or about September 24, 2004, Mitzi Link – the
supervisor of both Ms. Ellis and Mr. McKenna – went to Ms. Kagenski with a letter that
Ms. Ellis had received at her home.  The letter was written by Ms. Goss and contained
very personal, negative accusations against Ms. Ellis.  Ms. Ellis construed the letter as
a threat, and expressed concern for her safety.  Ms. Kagenski immediately suspended
Ms. Goss (the author of the letter) pending further investigation.

      It was during the investigation of this letter, in Ms. Kagenski's interview with Ms.
Goss, that Mr. McKenna's repeated and flagrant violations of the electronic
communications policy came to light.  In the course of answering the questions put to
her about her letter, Ms. Goss revealed to Carol Kagenski that Mr. McKenna had sent
her numerous emails at work containing explicit sexual content.  She gave copies of
those to Ms. Kagenski.  Exhibit C.  One of these contained Mr. McKenna's explicit
description of masturbating at work.  Ms. Goss also alleged that Mr. McKenna was
circumventing the Internet security system, that he had devised a method of accessing
prohibited cites and not "getting caught," and she provided a copy of an email she said
substantiated that. Exhibit C.

Mr. Daniel Cabot
July 6, 2005

Page 4

In the course of investigating Ms. Goss's conduct, Ms. Kagenski ultimately concluded that Ms. Goss had violated several Company policies, and Ms. Goss's employment was terminated. However, the conduct of Mr. McKenna, which now became known, also had to be investigated. Mr. McKenna was placed on suspension pending investigation into his use of the Company computers, email and Internet. HR inspected Mr. McKenna's Outlook "inbox" and "sent items" folder and found the following:

- an email message containing 4 pornographic pictures of a male and a female in sexual positions, sent out from Nestlé email;
- an email from Kevin McKenna to his wife regarding his addiction to dating other women;
- an email from Kevin McKenna to Nestlé employee Mary Lanning telling her she "looks radiant";
- an email from Kevin McKenna to "Tammy Sparks" asking for a date and containing explicit sexual language;
- an email from Kevin McKenna to his supervisor, Mitzi Link, commenting on her "look" and saying that she "turned" his head;
- an email string between Kevin McKenna and Nancy Goss containing sexual innuendo;
- a sexually explicit email from Kevin McKenna to himself about "what gets me hot".

Exhibit D (Emails printed from K. McKenna Outlook).

These emails were found to violate the Company's Electronic Communications Policy which requires that all use of the Company computer, internet access and email be in a manner consistent with the law and Company policy and expressly prohibits "accessing, sending, forwarding, downloading, printing, or deliberate receipt of pornographic, obscene, indecent or other sexually explicit materials . . ." Exhibit E (Nestlé Purina Pet Care Information Security Standards, pp 3-4). Further, some of the content violated the Company policy against sexual harassment. Exhibit F (Notice of Non-Harassment Policy and Non-Retaliation Policy).

On October 14, 2004, Kevin McKenna was fired for multiple violations of the Electronic Communications Policy and the policy against harassment. The decision also took into account that Mr. McKenna had previously been disciplined for violating the policy against harassment. Exhibit G (Oral & Written Warning).

The investigation also resulted in a written disciplinary warning and suspension of Ms. Ellis regarding excessive time spent on personal matters while at work. Exhibit H.

Mr. Daniel Cabot
July 6, 2005

Page 5

Following his termination, Mr. McKenna wrote a long email to his supervisor, Mitzi Link and the plant manager, Dante Benincasa, in which he protested the Company's termination decision. Significantly, he admits in this email that he violated the Electronic Communications Policy. He also repeatedly characterizes his earlier "complaint" to HR as one regarding his fear that Nancy Goss might "go postal," as he put it, and do harm to him or to another employee at the facility. Nowhere in this email does he contend that he complained about sexual harassment or unlawful activity of any other nature. Exhibit I (October 18, 2004 email from K. McKenna to M. Link and D. Benincasa).

## II.    Legal Argument.

In his EEOC Charge, Mr. McKenna claims that he was terminated because of his sex (male) and in retaliation for complaining of sexual harassment. Based on the record described above, his claim would fail for multiple reasons.

### A. Mr. McKenna's Claim Fails Because He Cannot Establish a *Prima Facie* Case of Discrimination.

First, Mr. McKenna's own allegations in the Charge undermine his sex discrimination claim. He states on the one hand that he believes was fired because he is a male – rather than because he violated Company policy. But then he goes on to allege that another male employee was retained despite his violation of the same policies. This does not show that males are judged more harshly under the Company electronic communications policy. It shows the opposite, *i.e.*, that another *male* – as opposed to female – employee remained employed despite his alleged violation of the very same policies. This completely negates a gender discrimination claim by Mr. McKenna.

Second, contrary to Mr. McKenna's assertions, both female employees involved in the so-called love triangle were disciplined for their conduct which violated Company policies. Ms. Goss was fired for violating the policy against workplace violence when it was determined that her letter to Lisa Ellis constituted an overt threat. Ms. Ellis received a written warning and was suspended without pay for wasting time on personal matters at work. Although Mr. McKenna alleges that these two women sent him sexually explicit emails, upon investigation it was determined that neither Ms. Goss nor Ms. Ellis violated the electronic communications policy. The emails they sent to him concerned personal (as opposed to work-related) matters, but they were not sexual or pornographic.

Mr. Daniel Cabot
July 6, 2005

Page 6

In sum, Mr. McKenna cannot show that he was treated differently than members of the opposite sex, as a female employee involved in the same set of circumstances that led to his termination was also fired.

## B. Mr. McKenna's Retaliation Claim Fails Because He Cannot Show that He Made any Statutorily Protected Complaints.

In order to prove retaliation for complaining about sexual harassment, Mr. McKenna must show that he actually complained about sexual harassment. While this often is a case of the charging party's word against someone else's, here documentary evidence created by Mr. McKenna himself directly undermines his claim that he complained about sexual harassment. Instead, Mr. McKenna informed HR that his former paramour, Nancy Goss, was jealous about his supposed new relationship with another woman, Lisa Ellis. He claimed that Ms. Goss was "obsessed" with him and that he had emails to show this, but then he declined to give those emails to HR. However, Mr. McKenna's complaint in this regard cannot constitute a complaint of sexual harassment under Title VII. Indeed, hostile conduct of a former paramour is not actionable under Title VII because it is not perpetrated based on the targeted employee's gender. *See Succar v. Dade County School Board*, 229 F.3d 1343 (11th Cir. 2000) (upholding summary judgment in favor of employer and denying Title VII liability where "harassing" employee's conduct was based upon "contempt for [plaintiff] following their failed relationship"); *see also, e.g., Keppler v. Hinsdale Township High School*, 715 F. Supp. 862 (N.D. Ill. 1989) ("[D]esire to continue prior consensual intimate relationship is not, on its own, an impermissible basis for personnel action under Title VII.").

Mr. McKenna's next "complaint" – documented in his post termination email to Mitzi Link (Exhibit I) – concerned his fear that Ms. Goss might become violent against him. Suffice to say Mr. McKenna never complained about sexual harassment and his own letters to HR and his supervisor confirm this. Accordingly, his retaliation claim will fail for his inability to prove the most critical element – *i.e.*, that he made a statutorily protected complaint.

## C. The Company had a Legitimate Business Reason for Terminating Mr. McKenna's Employment.

Finally, even if Mr. McKenna can establish a *prima facie* case of retaliation or discrimination, his claim would fail because the Company had multiple legitimate, non-discriminatory reasons for its action. First, as is well documented and admitted by Mr. McKenna, he clearly violated the Company electronic communications policy. Second, Mr. McKenna's emails evidenced comments that violated the policy against harassment, and he had previously

Mr. Daniel Cabot
July 6, 2005

Page 7

received a written warning for violation of that policy. Mr. McKenna's misconduct was blatant, uncontroverted and admitted by him, in writing. The Company, thus, had no choice but to terminate his employment, regardless of whether he had previously complained of sexual harassment.

### III.    Conclusion.

For the foregoing reasons, the respondent respectfully asserts that the Commission should issue a "no cause" finding in this matter.

If you have any questions or further requests for information, please feel free to call me at (818) 549-6475.

Very truly yours,

*[signature]*

Lora Silverman
Contract Attorney
Nestlé North America Legal Department

# Attachment G

**TO:**     Lisa Ellis

**FROM:**   Mitzi Link

**DATE:**   October 27, 2004

## WRITTEN WARNING
### Violation of NPPC Electronic Communication Acceptable Use Policy

As a result of our investigation and discussion with you, we have concluded that you violated the NPPC Electronic Communication Acceptable Use Policy in an inappropriate and excessive manner.

You reviewed, acknowledged, and agreed to adhere to the guidelines of the stated policy, which prohibits access to inappropriate sites as well as excessive, personal use. Yet, your activity resulted in a great deal of lost productivity while spending an inordinate amount of time accessing the Internet, the email system, and/or the company telephone systems for excessive personal communications.

It has been determined that your violation and unacceptable behavior warrants this Written Warning be issued at the Final level, which interprets any additional violations of Company policy will lead to further disciplinary action, up to and including immediate discharge without warning.

! As a means of reiterating the seriousness of this Written Warning, you are suspended without compensation effective today, Wednesday, October 27, 2004. Your designated return to work date is Monday, November 1, 2004. Upon your return, I will have a follow up discussion with you and provide a clear definition of what my expectations of you will be going forward.

_____     10/27/04        _____     10/27/04
Manager Signature                Date         Employee Signature                Date

CC: Carol Kagenski

# Attachment H

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KEVIN H. MCKENNA** | : | |
| | : | **CASE NO. C2 05 976** |
| *Plaintiff,* | : | |
| | : | |
| vs. | : | **JUDGE MARBLEY** |
| | : | |
| **NESTLE PURINA PETCARE CO.** | : | |
| | : | **MAGISTRATE JUDGE KEMP** |
| *Defendant.* | : | |

**DEFENDANT NESTLE PURINA PETCARE CO.'S RESPONSE TO**
**PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant
Nestle Purina Petcare Co. (hereinafter "Defendant") hereby submits the following
answers and responses to Plaintiff Kevin McKenna's (hereinafter "Plaintiff") Second
Request for Production of Documents (hereinafter "Discovery Requests").

**GENERAL OBJECTIONS**

      1.    Defendant objects to Plaintiff's Discovery Requests to the extent they
impose burdens beyond the obligations of discovery as proscribed by the Federal Rules
of Civil Procedure and are not reasonably calculated to lead to the discovery of
admissible evidence.

      2.    Defendant objects to Plaintiff's Discovery Requests so far as they seek
information and/or documents not in Defendant's possession and/or control, or
information and/or documents solely in Plaintiff's possession.

1

3.     Defendant objects to Plaintiff's Discovery Requests so far as they seek the disclosure of information which is protected by the attorney/client privilege and the work product doctrine and is otherwise protected from disclosure.

4.     Defendant objects to Plaintiff's Discovery Requests to the extent they seek information not readily available to Defendant, but which may become available as discovery in this action progresses.

5.     Defendant expressly reserves all objections as to competency, relevancy, materiality, and admissibility of the answers contained herein and any objections to future discovery requests.

6.     Defendant asserts it is responding to the Discovery Requests to the best of its present knowledge and belief, and expressly reserves the right to supplement the responses contained herein, if necessary, while affirming it has no duty to supplement the answers contained herein, except as provided by Rule.

## REQUEST FOR PRODUCTION OF DOCUMENTS

**Request No. 1**

Defendant objects to production of documents pursuant to this Discovery Request to the extent some or all of the documents may be in Plaintiff's possession. Defendant further objects to the extent certain documents responsive to this Discovery Request are protected by the attorney-client privilege and/or work product doctrine. Without waiving the foregoing objection, relevant documents, not subject to any privilege, are attached.

Jonathan R. Secrest (#0075445)

2

**Request No. 2**

      Defendant objects to the production of documents pursuant to this request to the extent some or all of the documents may be in Plaintiff's possession. Without waiving the foregoing objection, relevant documents are attached.

                                 Jonathan R. Secrest (#0075445)

**Request No. 3**

      Defendant objects to the production of documents pursuant to the foregoing Discovery Request based on Plaintiff's attempt to preclude Plaintiff's Motion to Preclude Material Evidence. Once the Court rules on this Motion, Defendant will seasonably supplement this discovery response if appropriate.

                                 Jonathan R. Secrest (#0075445)

**Request No. 4**

      Defendant objects to the production of documents pursuant to the foregoing Discovery Request based on Plaintiff's attempt to preclude Plaintiff's Motion to Preclude Material Evidence. Once the Court rules on this Motion, Defendant will seasonably supplement this discovery response if appropriate.

                                 Jonathan R. Secrest (#0075445)

**Request No. 5**

Defendant objects to the production of documents pursuant to the foregoing Discovery Request based on Plaintiff's attempt to preclude Plaintiff's Motion to Preclude Material Evidence. Once the Court rules on this Motion, Defendant will seasonably supplement this discovery response if appropriate.

Jonathan R. Secrest (#0075445)

**Request No. 6**

Relevant documents are attached.

**Request No. 7**

Defendant is still attempting to procure documents responsive to this Discovery Request and will produce them to Plaintiff when they become available.

**Request No. 8**

Defendant previously produced this document pursuant to Plaintiff's First Request for Production of Documents.

Respectfully submitted,

**MAGUIRE & SCHNEIDER, LLP**

Keith W. Schneider    (#0041616)
kwschneider@ms-lawfirm.com
Jonathan R. Secrest    (#0075445)
jsecrest@ms-lawfirm.com
Sharlene I. Chance    (#0070999)
schance@ms-lawfirm.com
250 Civic Center Drive, Suite 500
Columbus, Ohio 43215
Telephone: (614) 224-1222
Facsimile: (614) 224-1236
*Attorneys for Defendant*

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served, via hand delivery, this _1st_ day of March 2006, to the following:

Kevin H. McKenna
4885 Adamsville Road
Zanesville, Ohio 43701
*Pro Se* **Plaintiff**

Jonathan R. Secrest (#0075445)

5

# Attachment

# I

## Kevin McKenna

| | |
|---|---|
| **From:** | Kevin McKenna [KMCKENN@columbus.rr.com] |
| **Sent:** | Wednesday, June 07, 2006 10:07 PM |
| **To:** | Keith Schneider; Jon Secrest |
| **Subject:** | RE: Electronic Service - "Privilege Log - Comprehensiveness.pdf" Attached |
| **Importance:** | High |

Gentlemen,

Just 2 examples of the fact you are withholding other privileged communications from the "Privilege Log", or that you are withholding other relevant documents from discovery. You can not simply contend that there is no supporting correspondence to these documents, yet you have not produced such documents, nor claimed them as privileged.

NOW, you will simply add the non-disclosed portions of these communications to your Privilege Log. AMEND your Privilege Log IMMEDIATELY, or I am extremely anxious to see just how amused Judge Kemp is with a stunt like this.

-----Original Message-----
**From:** Kevin McKenna [mailto:KMCKENN@columbus.rr.com]
**Sent:** Sunday, June 04, 2006 4:17 PM
**To:** Keith Schneider; Jon Secrest
**Subject:** Electronic Service - "Privilege Log - Comprehensiveness.pdf" Attached
**Importance:** High

Gentlemen,

Please find the attached document titled "Privilege Log - Comprehensiveness.pdf"

Thank you,

Kevin H. McKenna

*Lisa,*

I am writing to let you know that I forgive you. Not because I want to, nor because you deserve it in ANY way, but because I will not allow this fiery anger you've put in my heart to burn in me any longer. Just like Frank, Ed, and B before you, you, my dear, are NOT worth it!

Though I have to admit, I never though my heart could ever be broke by another woman, it was by you. I went on the web and found the definition of friend to be "one attached to another by affection or esteem, one that is not hostile, one that is of the same notion, party or group." I forgive you for taking that friendship – that comfort I felt in the safe-haven of your friendly affection for me – and twisting it into something vile and ugly by betraying it/me in the most devastating manner imaginable. Making me live through this nightmare not once – but now, thanks to you, twice!!!

My therapist (yep, this spiteful malice I've experienced from you has sent me into therapy, just as Frank's betrayal did) says in order to heal I must forgive. Forgive the hurt, forgive the fact that now I've not only lost my lover and confidante in B, but also forgive that because of your back-stabbing treachery I have now also lost the only other "friend" I've let into my life since Bev's betrayal with Frank. Two losses in one mighty blow – gone my entire support system other than my parents – just like Frank and Bev. Funny how I'm dumb enough to trust again and funny how history repeats itself. I attract treacherous parasites like flies to shit, my friend. And I forgive you for it – not because you deserve it, but because I must to heal and move on.

I forgive you for the conniving, shrewd, calculated way you, just a parasite lives off its host, spat on everything that was our friendship by waiting for just the right moment to "snag" B. I forgive you your opportunistic, parasitic personality; I forgive you for sabotaging my grief and for cannibalizing on it. Seizing the "opportunity" to "get some", whether it would hurt your best friend or not. I forgive you the deceit, treachery, unfaithfulness to our friendship, the fraud, the hypocrisy, and the ultimate sell-out. I forgive you your envy for what I had, and for seizing it the very moment you felt it available for your taking. Harvesting what was my good fortune – and savoring it as you had hoped and longed to savor it all along.

I forgive you your weakness with men. I forgive you your need for sexual attention from EVERY man no matter whom it hurts or what it costs or who's left to pick up the pieces of your deceit.

I should have know that anyone who would have affairs with as many married men as you have could not possibly be faithful to a friendship either. In the back of my mind it was always there gnawing at me – every time you'd flirt too much right in front of me OR behind my back, every time you'd e-mail him without including me, every time you'd make a comment like "I'm not gonna cut my nose off despite my face" and then realize what you said... EVERY time you'd promise – I'll NEVER do anything with B on my own... that gnawing doubt was always there. I even told B once that I felt you had a knife always poised at my back ready to stab at any moment. He agree with me that you have issues with the etiquette of accepting gifts appropriately and that you have issues with dependability in your friendship... Guess he was RIGHT!!! Oh, and BTW, my parents are STILL waiting on that thank you note for the $500 they spend on 2 little boys

Case: 2:05-cv-00976-ALM-TPK Doc #: 42-2 Filed: 06/12/06 Page: 30 of 30 PAGEID #: 587

## Kagenski,Carol,ZANESVILLE,NPPC

**From:** Nancy G [nancyg9798@hotmail.com]
**Sent:** Monday, October 04, 2004 2:32 PM
**To:** Kagenski,Carol,ZANESVILLE,NPPC
**Subject:** FW:

This website went clear over my head and I'm not sure what his point was,
but I'm forwarding this 'cause it may help explain how he accesses the
websites he does during work without getting caught...


>From: "K M" <some_tall_guy44@hotmail.com>
>To: nancyg9798@hotmail.com
>Date: Mon, 21 Jun 2004 15:39:27 -0400
>
>found some interesting stuff here.
>
>http://www.intersurf.com/~bevans/Memes/Memes%20Text%20B.htm
>

1